# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
Plaintiff,

v.                                                    Crim. No.: 18 Cr. 827 (GHW)

MIYUKI SUEN,
Defendant.


## SENTENCING MEMORANDUM


RESPECTFULLY SUBMITTED,


SULLIVAN & BRILL, LLP
Attorneys for Ms. Suen


By: Steven Brill


Dated: January 27, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
Plaintiff,

v.                                    Crim. No.: 18 Cr. 827 (GHW)

MIYUKI SUEN,
Defendant

MS. SUEN'S SENTENCING MEMORANDUM
PURSUANT TO THE UNITED STATES SENTENCING GUIDELINES
AND 18 U.S.C. § 3553(a)

TO THE HONORABLE
GREGORY H. WOODS
UNITED STATES DISTRICT JUDGE
FOR THE SOUTHERN DISTRICT OF NEW YORK

## I.    INTRODUCTION

Miyuki Suen is scheduled to be sentenced before this Court on February 10, 2020, pursuant to her guilty plea to a charge of Conspiracy to Traffic Counterfeit Goods in violation of 8 USC 2320(a)(1). Under the terms of a plea agreement, Ms. Suen faces a Total Offense Level of 21. As is detailed in the Pre-Sentence Report ("PSR"), the base offense level is 8, with 2 points added pursuant to USSG §2B5.3 (b) (3) (A), an offense involving the manufacturing and importation of infringing items. The lion-share of the total offense level is the 14 points added pursuant to USSG §2B5.3 (b) (1) and § 2B1.1 (b) (1) (H), based on stipulated assessment of the infringement amount of $710,400. In its PSR, Probation has calculated the amount for which Ms. Suen is directly, reasonably accountable is $140,202.93.

1

After reducing the Total Offense level by 3 points for timely acceptance of responsibility, pursuant to USSG §3E1.1(a), (b), the Total Offense Level is 21. Ms. Suen has no criminal history, and, as such, her advisory guideline range is 37-46 months. The Court is not constrained by any statutory minimum sentence.

### Probation's Sentencing Recommendation

Following its pre-sentence investigation, Probation recommended that this Court impose a variance, and sentence Ms. Suen below the guidelines recommendation to a term of imprisonment of eighteen (18) months, followed by a term of (3) years Supervised Release. To support their recommendation for a variance, Probation explained that,

> The Guidelines in this case indicate that a sentence of 37 to 46 months' imprisonment is warranted. The statute directs the court in determining a sentence, to consider the need for the sentence to promote respect for the law, provide just punishment, afford adequate deterrence to future criminal conduct, and protect the public from further crimes of the defendant. <u>**Suen does not appear to be a danger to society, as she has no history of violence and has demonstrated herself to be a cooperative and productive individual while under supervision**</u>.

(PSR 23) (Emphasis added).

In fact, Probation implies that the reason it is recommending any prison time at all is because it cannot "overlook the fact" of Ms. Suen's 2007 arrest for an offense involving counterfeiting. The Court, however, is urged to consider that this prior conduct: (1) involved the selling of goods at a flea market, (2) occurred more than ten years ago, and (3) did not result in a criminal conviction. Notwithstanding this prior incident, Ms. Suen does not discount her history or in any way mitigate her acceptance of responsibility. Rather, it is respectfully submitted that the facts of

Ms. Suen's life and her personal characteristics, discussed below, weigh far more heavily and are more relevant. It is those, along with the other § 3553(a) factors, that should inform the Court as to what would be considered just punishment.

### Our Sentencing Recommendation and Justification

Although we pose no objection to the adjusted Guideline calculation, which results in a sentencing range of 37-48 months, we join in Probation's recommendation to the Court that a variance below the advisory guideline is warranted and appropriate under §3553(a).

As the Court is well-aware, in imposing a federal sentence now, this Court must follow the dictates of *United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 127 S.Ct. 2456 (2007); *Kimbrough v. United States*, 128 S.Ct. 558 (2007); and *Gall v. United States*, 128 S.Ct. 586 (2007).   It must correctly calculate the guideline range, consider that range as but one factor among all other §3553(a) sentencing factors, and ultimately and impose a sentence sufficient but not greater than necessary to achieve the goals of sentencing. *Kimbrough*, 128 S.Ct. at 570; 18 U.S.C. §3553(a). District judges are now empowered with "considerable discretion" in determining whether a non-guideline sentence is justified. *United States v. Jones*, 531 F.3d 163,171 (2d Cir. June 24, 2008).

With the guidance of this now well-settled federal sentencing law, given Ms. Suen's lack of criminal history, her dedicated, and single-handed parenting of her son, the support of her family and friends (as reflected in the attached character letters of support), her successful efforts to maintain full-time and gainful

employment, her full-compliance while out on bail, and her confined, lesser role in the conspiracy, we respectfully recommend this Court use "parsimony" and "considerable discretion" and impose a sentence of home confinement, a term of Supervised Release, and our stipulated restitution.

Home confinement, followed by a term of Supervised Release, and the conditions associated with that supervision, can meet the Court's interest that: (1) Ms. Suen be punished for the crime that she has committed, (2) enable her to continue to work hard, (3) allow her to be present and support her child as he enters his college years, and (4) assure she abstain, and is deterred, from any further criminal conduct (which is highly unlikely). In support of our recommendation, we wish to highlight the following for the Court's consideration:

*First*, despite a childhood that presented challenges far beyond her age and ability to deal with them, Ms. Suen came to the United States and showed herself as someone with a willingness to work hard. Virtually, not a day has gone by during which Ms. Suen was not gainfully employed – whether salesperson, bartender or support staff at senior center. Since her arrest, she continues to work full-time.

*Second*, Ms. Suen has touched and influenced her family and friends in considerable and commendable ways. The laudable effect she has over others and the respect others have for her is reflected in the letters attached as Exhibits A-I.

*Third*, the nature and circumstances of Ms. Suen's conduct in this conspiracy supports a non-incarceratory sentence. Ms. Suen was far from the leader of this organization; she did not sell the sneakers nor received any meaningful profit from

those sales. Instead, she was paid a day-wages for overseeing and helping load and unload boxes. On a few occasions, as a native Chinese-speaker she was asked to act as translator with the higher-ups in China. There is no reason to doubt the PSR's estimation on the staggering amount of money generated by this conspiracy, but Ms. Suen made between $150 to $300 for each of the days she worked, which were sporadic, at best.

## II.   CERTAIN MITIGATING FACTORS UNDER §3553 STRONGLY WARRANT A SENTENCE BELOW THE GUIDELINE RANGE

When the Supreme Court changed Section 3553(a) from mandatory to advisory, it was with the intent that a sentencing court determine a "sentence sufficient, but not greater than necessary" to comply with the purposes of punishment, while taking into account "the nature and circumstances of the offense and the history and characteristics of the defendant." *Gall*, 552 U.S.at 50. More plainly, a judge is fashioning a sentence, not for a statue, but for a particular individual considering the facts surrounding his or her offense.

The Ninth Circuit explained the importance of the person as follows:

> Central to our system of values and implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social policy, that human beings are to be treated not simply as means to a social end like deterrence, but also—  and always—as ends in themselves

*United States v. Barker*, 771 F.2d 1362, 1368–69 (9th Cir. 1985). The Supreme Court instructed that a sentencing court may deviate from a mechanical application of the guidelines "perhaps . . . because the Guidelines sentence itself fails properly

to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita*, 551 U.S. at 367.

Furthermore, the Second Circuit has made clear that courts should impart the lowest possible sentence that takes into account the factors set forth in Section 3553(a). *See United States v. Dorvee,* 616 F.3d 174, 184 (2d Cir. 2010) ("Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not . . . impose the higher.") (Internal citation omitted).

Here, we do not assert that the guidelines range in Ms. Suen's PSR are incorrectly calculated. Instead, we encourage a view of Ms. Suen and her criminal conduct through the lens of the Section 3553(a) factors. In such context, we believe a below-Guidelines, non-custodial sentence of Supervised Release is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

### *Ms. Suen's personal history and characteristics weigh in favor of a below guideline sentence*

#### *Life before coming to the United States*

Almost from the day she was born, Ms. Suen learned that she was, essentially, on her own. Ms. Suen was born in China in 1975, a few years before the official one-child policy was enacted. Her parents had another child, a boy, three years later. When she was only six years old, her parents and her brother left her in China with her great-grandparents as they relocated to Hong Kong. Although she has little memory of the move, she was told that it was "too expensive" to bring her as well.

6

At ten years old, she was brought to Hong Kong, ostensibly to care for her seven-year-old brother. Although the PSR characterizes this as a 'reuniting,' the facts make it clear that her value was as the (unpaid) baby-sitter for her brother. This was reinforced by the fact that four years later, her parents took her brother into the United States in order to provide her brother a better future. Ms. Suen was left in Hong Kong with her grandparents.

Her parents and brother obtained permanent legal resident status, but although they "visited her," they did not sponsor her immigration to the United States until she was 20 years old.

There is no way to extrapolate the true significance of growing up in a culture in which one's gender is devalued as the result of an official government policy. It is not hard to imagine, however, how isolating and confusing it was at six-years-old, to see her parents and her brother leave her essentially alone. This was Ms. Suen's first lesson, even at an age when she had no ability understand it-- that she was on her own in the world.

This was reinforced at ten-years-old, when her value was measured by her ability to care for her brother, until she was left again four years later so that her parents could provide him, not her, a better life. When she finally arrived in the United States, it was without a knowledge of the culture and customs of the country and, more importantly, without the advantage of a well-defined sense of self-worth.

### *Ms. Suen willingness to work hard*

Perhaps given the experiences of her early life, Ms. Suen has never expected someone else to take responsibility for her. For last two decades, she has never been without a job.[1] Despite her limited education and her challenge with reading and writing English, she has found employment as a bath supplies sales-person, a bartender, and most recently, since 2018, a caregiver at a senior center in Chinatown. She has continued to work full time even while on supervised release.

Working hard, however, does not guarantee financial success, and even though she has been constantly employed, she barely earned over the poverty level (her 2018 adjusted gross income was $15,000). This has led to her living with her parents in Queens, where she still resides today.

It is also important to note that, in 1999, Ms. Suen was briefly married to a man named Bill Tong. The marriage lasted barely long enough to produce a child, Justin, the most important thing in Ms. Suen's life. Shortly after Justin's birth, in 2000, Ms. Suen was divorced, and Justin's father returned to China; he left her, like so many in her life had before, to fend for herself and their child.

Though by no means offered as an excuse, to understand the motivation for Ms. Suen's involvement in this enterprise, it is important to place her actions in context. With no support from Justin's father, Ms. Suen's life as a single mother was a constant struggle to make ends meet. To supplement her meager income, Ms.

---

1 The only exception was that for a period of about two years around the time her son was born she took a leave from her job.

Suen did participate in helping the loading and unloading of boxes of counterfeit Nike Sneakers. The few hundred dollars she made engaging in this conduct helped with the pressure she faced providing the basic essentials for herself and her son. In a letter attached as **Exhibit A**, her son Justin writes, "[m]y mother would always work as hard as she could so she could get food in my stomach and always made sure that I would have enough to support myself. She would always give back and give it her all, even though she is tired and didn't have much money."

While now Ms. Suen understands the scope and breadth of the conspiracy, and admits it was an awful decision to participate in something that she knew was wrong, on a granular level, her day-to-day experience was that what she was doing was labor, a job. She realizes, in the harsh reality as she stands before the Court, this compartmentalization has now led to severe consequences for her, for her son, and for her future.

### The content of Ms. Suen's character reflects much more

To be sure, many defendants stand before the Court and can profess a challenging early life and claim a creditable worth-ethic; Miyuki Suen, is more than that. Despite having the opportunity, even the justification, to put herself and her own needs and desires first, she has done just the opposite. Similarly, it would be easy to dismiss the love and devotion that a defendant feels towards a child as common, but that would discount the fact that Ms. Suen never felt a parent's unconditional love and devotion herself. He son describes their relationship: "I am supported by my mother every day and she never gives up on me even though I

have not given much back to her. . . My mom has been there my whole life." (Exhibit A). Joelle Lum, a close friend of Justin, observes in a letter attached as **Exhibit B**, "Their bond is very strong. They call each other throughout the day to see if the other has eaten yet and are always acting in the other's best interest. For example, Justin always tells me that he wants to work hard in college to make his mother proud." Renne Jin, an individual who has known Ms. Suen for more than twenty years, in a letter attached as **Exhibit C**, sums up the connection: "Miyuki is a very dedicated mother to her son Justin, who has always taken priority in her life[.]"

In fact, people who know Ms. Suen and Justin express concern regarding what would happen if Ms. Suen were sentenced to prison. Joelle Lum observes, "[i]f anything were to happen to Ms. Suen, Justin's life would be shattered." (Exhibit B). Mathew Lau, Justin best friend, writes in a letter attached as **Exhibit D**, "Justin already lost his father and if he loses Miyuki not only will he be facing many hardships, but he also won't have a mother to support him when times get difficult."

It is more than just her son who has been touched in a profound way by Ms. Suen. By her actions, she has extended the traditional definition of family to include so many others. Despite being married for a little more than a year, three members of her ex-husbands family have written letters on her behalf. Pun Tong, in a letter attached as **Exhibit E**, says that despite the divorce almost two decades ago, Ms. Suen "is forever my sister in law." He describes Ms. Suen's actions when his mother took ill:

> My mom had a ruptured aneurysm four years ago. She survived
> the first rupture and required a lot of time and care during

> rehab. Miyuki was there, rain or shine, to visit, spent time, and
> took good care of my mom.   Weeks later, unfortunately, my
> mother had her 2nd ruptured aneurysm and passed away. This
> was a very difficult time for my family. Miyuki was there to
> comfort us all. I am very grateful that Miyuki provided
> unconditional love and care for my mom during such a difficult
> time.

(Exhibit E). Remembering that time, Thuc Phan Quan, another "ex-sibling" recalls,

in a letter attached as **Exhibit F**:

> When her ex-mother in law was at the hospital and couldn't care
> for herself, I witnessed Ms. Suen changing her soiled diaper
> because the nurse was negligent. Ms. Suen wanted her ex-
> mother-in-law to be comfortable and saw how frustrated and
> upset she was from being soiled so she went ahead and helped
> her instead of waiting a minute longer.

(Exhibit F).

Indeed, it is common theme that Ms. Suen embraces others as family. Andy

Jin, a friend of more than 15 years, recounting an early outing with Ms. Suen writes

in a letter attached as **Exhibit G**, "[a]lthough I was not part of the immediate family

I was treated equally as one of them. Miyuki was always about taking care of her

family and has always treated me as a brother." Mathew Lau writes, "Miyuki is like

a mother figure to me. She treats me just like her own son, with respect and

kindness." (Exhibit D). In fact, Justin states, "[m]y mother had given back so much

to me and my friends that even my friends see my mother as their own." (Exhibit

A).

The common refrain from those who know her best is that Ms. Suen considers

others before she considers herself. "She is a kind and generous person who is well

regarded by those who know her and always puts the needs of others before her

own." (Exhibit C); "Miyuki is kind and generous person who puts others' needs before her own." (**Exhibit H**, letter from Peter Tong); "She always put others ahead of herself and to me is more than just a friend; she is family." (Exhibit G).

This genuine care and concern is reflected in her current job at Woodhaven Lifestyle Senior Center, Inc., where she works fulltime as a caregiver. Her son observes, "[m]y mother now works for an elder day care and when I would go and visit her at work I see all the elders being so happy to see her as she gives so much love to them and they all would appreciate her hard work." (Exhibit A).   Thuc Phan Quan discusses her work at the senior center noting,

> [Ms. Suen] is aware of the care, comfort, and attention senior citizens need. Therefore, she commits long hours and efforts at the senior day care center in order to provide a positive and pleasant experience for all the elders. . . She respects the seniors ideas and opinions, and takes them into consideration when planning their visits to the senior center.

(Exhibit F). Finally, Pun Tong points out that "I see that Miyuki is genuinely passionate providing good care for seniors. For example, she buys fresh food from the supermarket to cook everyday rather than ordering takeout food, so that the seniors eat healthy." (Exhibit E).

The fact is that Ms. Suen, at her core is someone who works hard, cares for others in a genuine way and has had a significant positive effect on those around her.. It is our respectful hope that the Court will look at her history character and agree with the voices raised on her behalf:

- I firmly believe that if anyone deserves a second chance, it should be my sister in law, Miyuki Suen (Exhibit H);

- I believe that her strength and moral character will allow her to prove her an outstanding contributor to our society. I hope that you will give her the opportunity for a second chance (Exhibit C);

- I am hoping that Miyuki get[s] a second chance and could continue to provide good memories for the elderly (Exhibit E);

- She teaches us many [morals] in life and to give second chances to[ ] others, and now I am begging you to please give Miyuki Suen a second chance (Exhibit D);

- Without a doubt, given another chance, Ms. Suen would continue to work hard to serve her community (Exhibit F);

- I pray to this day that my mother will be forgiven and be treated with mercy because she has been a great mother to me and my friends and I believe that she deserves the best because of all the good she has done for everyone (Exhibit A).

### *The "nature and circumstances" surrounding Ms. Suen's crime are mitigating factors that warrant a sentence below the statutory guideline range.*

Ms. Suen does not now shirk her responsibility for entering a counterfeit goods conspiracy. She understands, and unequivocally admits, that her actions were wrong and illegal. Plainly, from her plea allocution, she has accepted full responsibility for her role, understands how wrong it was. When she speaks, you can hear the remorse in her voice. She does not offer excuses; she stands by her plea.

Mr. Suen was not a high-level, decision-making member of this conspiracy. She did not lead, organize or consequentially manage other members of the conspiracy, except at times to direct individuals where to stack or load boxes. She was lowest-level labor, and an occasional translator. She did not sell any of the counterfeit Air Jordans, and certainly did not share in the allegedly enormous profits of the conspiracy, save for her daily wage of between $150-$300.

Ms. Suen has no desire to minimize her conduct. Despite the non-violent nature of the crime, Ms. Suen understands fully that she committed a crime; she understands that she broke the law every day she worked at the warehouse. Looking at her son and her family is a constant reminder of her shame, remorse and regret.

### *The loss amount, while not contested, leads to a guidelines number that does not entirely reflect Ms. Suen's conduct*

As the Court is well aware, the guideline calculation is based in large part on the loss guideline under the "loss table" under USSG 2B1.1, which generates an offense level depending on the amount of loss incurred. In this case, the amount represents what Nike claims to have lost from the sale of the counterfeit Nike Air Jordans. For Ms. Suen's specifically, the amount of loss alleged was approximately $710,000, which falls in a range in the loss table between $550,000 and $1,500.000 and corresponds to an increase in guideline level of 14. Pursuant to the plea agreement, Ms. Suen stipulated to this loss figure, and raises no objection to it.

However, in its Final Pre-Sentence Report (PSR), Probation stated that.

> The victim in this case is Nike, whose merchandise was counterfeited and distributed by the defendants. As a result of Miyuki Suen's conduct during the instant offense, she is accountable for a total reasonably foreseeable loss of $140,202.93, which is based on the retail value of the infringing items and the amount Nike, the victim, expended on brand protection in uncovering the conspiracy.

(PSR ¶ 50).

Probation goes on to state,

> According to the Government, the financial impact of the infringement associated with the defendant is $710,400; however, the total reasonably foreseeable loss for which Suen is directly accountable for restitution purposes is $140,202.93.

(PSR ¶ 50).

Probation articulated the analysis of the way in which it determined "loss"

and restitution figures in an email exchange with the undersigned, Probation

asserted the following:

> *The difference on loss is because for guideline purposes, under 2B5.3, the fraud table is incorporated to use the "infringement amount" to add to the offense level. The commentary provide for certain definitions on whether the "infringement amount" should be the retail value of the infringed items (authentic goods) or the retail value of the infringing items (the counterfeit good).*

> *In this case, although the conspiracy as a whole involved the importation of huge number of sneakers for counterfeiting, whether that was reasonably foreseeable to the defendants was not clear to the Government. As such, the retail value of the infringing items found in the warehouse was used.*

> *With regard to restitution, since the Guidelines are driven by the loss that is reasonably foreseeable, this figure does not line up with the out-of-pocket losses suffered by the victim, and; therefore, we used the figure that Nike views as the out-of-pocket losses, which is based on the amount it expended on brand protection in uncovering the conspiracy was used*

15

Indeed, courts have discussed at length the manner in which the guidelines loss table can create sentencing ranges that "would be irrational." *See, e.g., United States v. Parris*, 573 F.Supp. 2d 744, 745 (E.D.N.Y. 2008).   In a concurrence in *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir.2013), *as corrected* (July 24, 2013), Judge Underhill encapsulated the challenge with the loss guidelines as follows:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, "For the small class of defendants ... convicted of fraud offenses associated with very large Guidelines loss calculations, the Guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.

*Id.* at 380 (Underhill, J. concurring).

The fact is that not all offenses are equal, and the Sentencing Guidelines do not always provide an adequate or appropriate benchmark. "[I]f the sentences so calculated are the product of placing an overwhelming emphasis on a factor that may be central to some frauds but largely incidental to others, the effect is to create, in the name of promoting uniformity, a sentencing disparity of the most unreasonable kind." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014). As Judge Underhill pointed out

> And not all actual loss is equally serious. A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large

16

> corporation able to absorb the financial consequences without a
> need to close plants, fire employees, or even declare the loss as
> material in public financial reports. Simply put, contrary to the
> assumption underlying the loss guideline, not all dollars of loss
> are fungible.

*Corsey*, 723 F.3d at 381.

This matters because when there is agreement that an individual warrants a downward variance from the guidelines, where that variance begins is essential. For example, Probation has recommended a below guidelines sentence of 18 months, starting from a guidelines sentence of 37-41 months. Yet if hypothetically, the loss attributable to Ms. Suen was determined at between $40,000 and $95,000, her guidelines sentence would be between 12-18 months. Thus, Probation's 18-month sentence would be at the high end of the guideline. Ms Suen's conduct, her crime, would not have changed, only Nike's imprecise "out of pocket" loss would have changed. In this way, particularly when there is accord that a variance is warranted, an acknowledgement of the potential unfairness of the loss calculation table is critical to determining an appropriate sentence.

## III.   REMAINING FACTORS OF 18 U.S.C. § 3553(A)

*The need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment, to avoid unwarranted sentence disparities, and to promote respect for the law*

The crime for which Mr. Suen stands convicted is serious, the imposition of a prison sentences for non-violent offenses by low-level laborers like Ms. Suen is unfair and unnecessary. There is little evidence that incapacitating members like Ms. Suen in conspiracies like the one in the instant case will cause a net decrease in

crime. The fact is that in such a large and far-reaching counterfeiting conspiracy such as this, those at the top, those that profit significantly, are motivated by greed and express a callous disregard for the law.   It is hard to realistically believe that those individuals will spend any time reconsidering their behavior by any sentence imposed on those in Ms. Suen's position.

The sad fact is that people so far down the chain, the foot soldiers as it were, are motivated by poverty and desperation. The nuance in the sentence in this case— supervised release versus six months versus 18 months—will not lessen the privation and hardship, and so will do little to deter others from stepping into those low-level positions. The root of the problem creating this type of conspiracy will remain, regardless of any pruning of the top leaves. "Disposing" of Ms. Suen even for 18 months just reinforces the idea to those at the top of the conspiracy that those at the bottom are disposable.

Meanwhile, a sentence of home confinement and 3-years Supervised Release serves as a just punishment and promotes respect for the law.   Given the testimonials written to the Court by Ms. Suen's family and friends, demonstrate that she is remorseful, regretful, and understands what a cost that wrong choice has exacted.

Should the Court impose our requested sentence, Ms. Suen will also face numerous collateral consequences, including "ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon

disenfranchisement." Michael Pinard, "Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity," 85 N.Y.U. L. Rev. 457, 459 (2010).

### *The Requested Sentence Can Provide Adequate Deterrence, and Protect the Public from Future Offenses by Ms. Suen*

Section 3553(a) (2) (B) provides that one of the purposes of sentencing is to deter the defendant from committing his crimes again. Section 3553(a) (2) (C) provides that an additional purpose is "to protect the public from further crimes of the defendant." Both of these aims can be satisfied with a sentence of a term of home confinement and 3-years of Supervised Release for Ms. Suen.

<u>Specific Deterrence</u>

A non-incarceratory sentence, together with Mr. Suen's self- driven need to do the right thing for her son, her deep regret, and the collateral consequence of a felony conviction, satisfy the aims of specific deterrence. In addition, the people who know her best, have without exception expressed admiration, even awe, at Ms. Suen's commitment to her community.

In addition, the requested sentence will provide specific deterrence and just punishment due to the threat of incarceration if Ms. Suen violates Supervised Release. *See United States v. Gall*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty"); quoting *United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that "[probationers are] subject to several standard conditions that substantially restrict their liberty");

19

*Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that "[probationers] do not enjoy the absolute liberty to which every citizen is entitled").

<u>General Deterrence</u>

A below-Guidelines sentence will not detract from the fact that Mr. Suen's predicament stands as a warning to those who would follow in her footsteps.   It is widely known that there is no empirical data that proves that the imposition of a prison sentence accomplishes general deterrence.   However, the fact that Ms. Suen's community will be aware of her day-to-day requirements that she comply with the strict conditions of the Probation Department, as well as any additional conditions this Court chooses to impose. This sentence, even though it is non-custodial, will send the important message to Mr. Suen's community that regardless of the circumstances that might exist, crime does not pay—more specifically; this type of crime does not pay enough to justify the ultimate price.

## V.     <u>MS. SUEN IS A GOOD CANDIDATE FOR VOLUNTARY SURRENDER</u>

Should the Court sentence Ms. Suen to incarceration, we respectfully request that Ms. Suen be given the opportunity to voluntarily surrender to a BOP to begin serving her sentence.   We further join in Probation's remarks contained in their PSR that, the defendant is viewed as a good candidate for voluntary surrender. Notably, she has kept all court appearances and has complied with all terms and conditions of her pretrial release. She is not viewed as a flight risk or a danger to the community.

VI.    <u>**CONCLUSION**</u>

There is much about Ms. Suen's circumstances that not contested: She was not leader or decision-maker in this conspiracy; she did not sell or receive profit from the sales of the counterfeit goods; she has worked hard her entire life; and she has no criminal record. There is even more that, regardless of any position the government might take, is certainly difficult to dispute: Ms. Suen came to this country having been given in her formative years precious few tools for success, yet she has persevered and found a commitment to family and friends; she has done far more good in her community than is reflected by the details of this crime; she has the potential to do even more good; and, most significantly, that a guidelines sentence is not greater than necessary.

This Court is well aware that framers of the sentencing statute have required district courts to take a parsimonious approach to criminal sentencing. Consistent with all the purposes of sentencing, courts should impose the lowest possible sentence to effectuate those goals. Given the factors articulated in this memorandum, we are asking this Court to sentence the person not the statute and impose a sentence of home confinement and three-years Supervised Release months is both reasonable and just.

**WHEREFORE**, it is respectfully requested that this Honorable Court consider the contents of this memorandum prior to imposing sentence upon Mr. Suen and sentence her to a below guideline range sentence of home confinement, and three-years Supervised Release, along with restitution.

**I CERTIFY** that a copy of this motion has been served via ECF upon: **THE US ATTORNEY'S OFFICE OF THE SDNY.**

**RESPECTFULLY SUBMITTED.**
In New York, New York, January 27, 2020.

SULLIVAN & BRILL, LLP
Attorneys for Mr. Suen

_____
By: Steven Brill

115 Broadway, 17th Floor
New York, NY 10006
(212) 566-1000
E-Mail: steven.brill@sullivanbrill.com